UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

JAMES J. AYO, III, ET AL.

VERSUS

HONEYWELL INTERNATIONAL, INC.,
ET AL.

CIVIL ACTION

NO. 06-688-BAJ-DLD

## RULING ON MOTIONS FOR SUMMARY JUDGMENT

This matter is before the Court on a motion for summary judgment filed by defendant, Triplex, Inc. ("Defendant") (doc. 59), and a cross motion for summary judgment on the issue of liability filed by plaintiffs, James J. Ayo, III, Robert F. Boykin, Clark Davis, III, and DeQual D. Pleasant ("Plaintiffs") (doc. 64). Plaintiffs have opposed Defendant's motion (doc. 62), and Defendant has opposed Plaintiffs' motion (doc. 66). Jurisdiction is based on 28 U.S.C. §1332.

## BACKGROUND

Plaintiffs allege that on August 11, 2005, while working for ProServe at the Honeywell International, Inc. ("Honeywell") facility in Baton Rouge, they were exposed to chlorine (doc. 71, p. 1). The chlorine release occurred when a chlorine transfer hose ("the hose") ruptured while chlorine was being transferred from a rail car to a processing unit (doc. 71, p. 1; doc. 59-1, p. 3). Plaintiffs were subsequently transported to the hospital, where doctors examined them, released them, and cleared Plaintiffs to return to work (doc. 71, p. 1). Plaintiffs were subsequently treated by a specialist (doc. 71, p. 1).

In the opposition to Defendant's motion for summary judgment, and in their cross motion for summary judgment, Plaintiffs allege that Defendant "fabricated" the hose "into a chlorine transfer hose", and subsequently sold the hose to Honeywell as a manufacturer (doc. 62, p. 2).  Plaintiffs allege that Honeywell's investigation of the incident revealed that the "failed hose ruptured after the braid had been weakened to the point that the hose could no longer contain the applied service pressure." Plaintiffs further allege that, on or about August 13, 2005, two days after the chlorine release, an investigation conducted by the U.S. Chemical Safety and Hazard Investigation Board uncovered "that the chlorine leak was caused by a ruptured transfer hose." Plaintiffs' expert, Florence Cone of Thielsch Engineering, Inc., confirmed Honeywell's finding that the hose was defective.  (Doc. 62, p. 2).

Plaintiffs allege the hose was defective because it had a leak in its Teflon® inner liner, and chlorine escaped through the leak, mixed with the moisture naturally occurring in the environment, and formed hydrochloric acid which compromised the "structural integrity" of the hose and caused it to rupture.  Plaintiffs note that the hose was in service for only twenty days before it ruptured.  Plaintiffs argue that, if the hose "had not been defective, it would not have failed in less than one month of service under the intended operating conditions."  (Doc. 62, p. 3).

Defendant argues that it is an authorized distributor for Crane Resistoflex ("Resistoflex") hoses, the actual manufacturer of the defective hose.  Defendant alleges that Resistoflex "manufactures chlorine transfer hoses comprised of a

Teflon® 'inner-core' (a plastic tube in the center of the hose) surrounded by Hastelloy-braided material (the reinforcing cover of the hose)." Resistoflex then ships lengths of the hose in bulk to Defendant and other distributors, and when a customer orders a Resistoflex hose, Defendant "cuts it to the desired length and then installs Resistoflex-approved fittings on each end. The hose is then visually inspected and pressure-tested by Triplex [Defendant], and all information is recorded on the test certificate before delivery to the customer." (Doc. 59-1, pp. 1-2).

According to Defendant, Honeywell adopted specifications for chlorine transfer hoses used to unload railcars, which, *inter alia*, "identify the manufacturer and supplier of the hose..." The specifications at issue "called for the use of a Teflon® Hastelloy-braided hose...manufactured by Resistoflex and supplied by Triplex..." and "the need for pressure testing in accordance with Chlorine Institute Guidelines."

The hose at issue was one of four Resistoflex hoses Defendant sold to Honeywell on June 14, 2005, and shipped on July 8, 2005. Defendant alleges that it "visually inspected the four chlorine transfer hoses and pressure tested them at twice the rated maximum working pressure (with Nitrogen) in accordance with ¶ 2.3.1 of Chlorine Institute Pamphlet 6...", and issued a test certificate to Honeywell that stated that each of the hoses passed pressure testing, and were therefore free of any defects. (Doc. 59-1, pp. 2-3).

Defendant alleges that, because the hose "ruptured at least a foot away from the nearest end-fitting on the hose, it could not have been caused or contributed to

by an end-fitting put on by Triplex" (Lloyd Decl., ¶ 3). Defendant further alleges that it "neither knew, nor could have known, of a defect in the Teflon® inner-cord of the hoses because that portion of the hose is hidden by the Hastelloy-braid reinforcing cover. Once the hose passes pressure-testing, there is no way for Triplex to discern the presence of such a defect inside of the hose" (doc. 59-1, p. 3). Additionally, Defendant argues:

> Triplex has never represented itself to be a manufacturer of Resistoflex chlorine transfer hoses.
> Triplex does not exercise any control over or influence the design, construction or quality of Resistoflex chlorine transfer hoses.
> Triplex has never labeled or held out any Resistoflex chlorine transfer hose as a hose manufactured by Triplex. To the contrary, Triplex puts a label on those hoses identifying "Crane Resistoflex" as the manufacturer.
> Triplex also puts a stainless steel tag on the hoses identifying itself as the assembler, a requirement of ¶ 9 of Chlorine Institute Pamphlet 6, Appendix A, so each hose can be traced back to its assembler and documentation of its assembly [sic].
> Triplex never held out any of the Resistoflex chlorine transfer hoses it sold to Honeywell as a "Triplex" hose.
> Honeywell never considered any of the Resistoflex chlorine transfer hoses it purchased from Triplex to be a "Triplex" hose.

(Doc. 59-1, p.4). Moreover, Honeywell's Reliability Engineering Leader, James E. Lloyd states in his affidavit:

> 4. The subject hose was manufactured by Crane Resistoflex Company.
>
> ***
>
> 10. Triplex never held out any of the Resistoflex chlorine transfer hoses it sold to Honeywell as a 'Triplex' hose.
>
> 11. Honeywell never considered any of the Resistoflex chlorine transfer hoses it purchased from Triplex to be a 'Triplex' hose"

(doc. 59-4, pp. 2-3 (Lloyd Decl., ¶¶ 4, 10, 11)).[1]

Plaintiffs allege that Defendant either incorrectly conducted the hose's pressure testing or failed to pressure test; and had Defendant properly pressure tested the hose, Defendant would have known that it was defective (doc. 62, p.13). Defendant alleges that it "visually inspected the four chlorine transfer hoses and pressure tested them at twice the rated maximum working pressure (with Nitrogen) in accordance with ¶ 2.3.1 of Chlorine Institute Pamphlet 6, Appendix A..." (doc. 59-3, p. 2 (Knew Decl., ¶ 10)).[2] Plaintiffs allege that "the disagreement between the data on the name plate [that Defendant affixed to the hose] and the test certificate raises doubts about the pressure testing (if any) that was performed by Triplex, Inc. on the failed CTH [chlorine transfer hose]" (doc. 62, p. 13). However, Defendant argues that:

> The test certificate issued by Triplex for the four hoses sold to Honeywell accurately reflects they had a maximum

---

[1] Plaintiffs argue that since Lloyd worked for Honeywell, he did not have personal knowledge of who manufactured the hose (doc. 62, p. 16).

[2] Jimmy Knew is the Baton Rouge branch manager of Triplex.

5

>working pressure of 500 p.s.i. and were pressure-tested by Triplex at 1,000 p.s.i.
>Any inaccuracies in the stainless steel tags are attributable to Triplex's failure to update its computer system to reflect an earlier decision by Resistoflex to change the maximum working pressure ratings for their one-inch chlorine hoses from 375 p.s.i. to 500 p.s.i. As a result, the computer-generated Triplex sales order for these hoses reflected the wrong maximum working and test pressures.

(Doc. 59-3, pp. 3-4 (Knew Decl., ¶¶ 21-23)).

## LAW AND DISCUSSION

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

In determining whether the movant is entitled to summary judgment, the court views facts in the light most favorable to the non-movant and draws all reasonable inferences in her favor. *Coleman v. Houston Independent School District*, 113 F.3d 528 (5th Cir. 1997). After a proper motion for summary judgment is made, the non-movant must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2411, 91 L.Ed.2d 202 (1986). The non-movant's burden, however, is not satisfied by some metaphysical doubt as to the material facts, or by conclusory allegations, unsubstantiated assertions or a scintilla of evidence. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). Summary judgment is appropriate if the non-movant

"fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Because this case is a diversity action, Louisiana substantive law applies. *Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). "Questions of Louisiana law are resolved 'the way the Louisiana Supreme Court would interpret the statute based on precedent, legislation, and relevant commentary.'" *Molden v. Georgia Gulf Corp.*, 465 F.Supp.2d 606, 610 (M.D.La. 2006) (quoting *Occidental Chemical Corp. v. Elliott Turbomachinery Co., Inc.*, 84 F.3d 172, 175 (5th Cir. 1996)).

In its motion for summary judgment, Defendant argues that it is not a manufacturer under the Louisiana Products Liability Act ("LPLA"), and, therefore, the Plaintiffs have no action against it under the statute unless Defendant knew or should have known of the defect but failed to declare the defect to the buyer. Defendant further argues that it would have been impossible for it to uncover the defect, and thus it is entitled to summary judgment in its favor (doc. 59-2, pp. 1-2). Plaintiffs argue that Defendant manufactured a finished hose by assembling all of its numerous component parts (doc. 62, p. 7). Plaintiffs also argue that Resistoflex's identification on the hoses "only indicated that Triplex, Inc., was using one of the components purchased from Crane Resistoflex to produce a CTH [chlorine transfer hose] that complied with the requirements of the Chlorine Institute Pamphlet 6, Appendix A" (doc. 62, p. 8).

The LPLA establishes the exclusive theories of liability of manufacturers for the damages caused by their products. La. Rev. Stat. § 9:2800.52. "Manufacturer" and "seller" are defined by the LPLA in pertinent part:

> (1) "Manufacturer" means a person or entity who is in the business of manufacturing a product for placement into trade or commerce. "Manufacturing a product" means producing, making, fabricating, constructing, designing, remanufacturing, reconditioning or refurbishing a product. "Manufacturer" also means:
> (a) A person or entity who labels a product as his own or who otherwise holds himself out to be the manufacturer of the product.
> (b) A seller of a product who exercises control over or influences a characteristic of the design, construction or quality of the product that causes damage.
> (c) A manufacturer of a product who incorporates into the product a component or part manufactured by another manufacturer.
> (2) "Seller" means a person or entity who is not a manufacturer and who is in the business of conveying title to or possession of a product to another person or entity in exchange for anything of value.

La. Rev. Stat. § 9:2800.53. Thus, the first issue before the court is whether Defendant is a manufacturer within the definition set forth by the LPLA.

Defendant relies on a case in which the Louisiana Second Circuit Court of Appeals found that a retailer-assembler of an electric sign was not a manufacturer under the LPLA's definition despite the fact that the retailer prepared the sign for installation by: inserting light bulbs, installing the sign's facing and lettering, fabricating and installing the mounting plate, fabricating a pole for the sign, and visually inspecting the sign. *Haley v. Wellington Specialty Ins. Co.*, 4 So.3d 307 (La.

App. 2 Cir. 2/25/09), *writ denied*, 2009-0532 (La. 4/17/09). In *Haley*, an electric-sign-installer was fatally electrocuted while installing a sign as a result of a pinched electrical wire. 4 So.3d 307 at 308. His widow filed a products liability action against the sign retailer, in part, for his failure to discover any hidden defects in the wiring. *Id.* at 310.[3] "In the petition, plaintiff alleged, *inter alia*, that the sign was defective, the defect existed while the sign was in the custody and control of Ward [sign retailer], and Ward knew or should have known that the defect existed." *Id.* at 309. The sign retailer moved for summary judgment, contending that he was not a manufacturer of the sign within the parameters set forth by the LPLA, and thus the sign retailer did not have a duty to inspect the sign for defects. *Id.* at 310. The district court granted summary judgment for the defendant and the court of appeals affirmed the decision, as an expert's post-accident inspection report pointed out that the defect in the electrical components of the sign occurred:

> 'at the time of fabrication of the sign.' Ward clearly assembled the sign, as well as performed other actions necessary to prepare the sign for installation. However, there is no indication in the record that any of the actions taken by Ward had anything to do with the installation of the inner workings of the sign, including the inner wiring and/or installation of the ballasts, or that Ward contributed in any way to the pinching of the wire. Although plaintiff alleged that Ward 'tightened the ballast bolts, which caused the damage to the wire,' plaintiff produced no evidence to substantiate that claim. Based on these facts, we find that Ward's actions with regard to the sign did not rise to the level of exercising 'control over or influencing a

---

[3]The sign retailer was Johnny Ward, d/b/a Ward Sign Company.

9

> characteristic of the design construction or quality of' the sign in a manner which would elevate Ward to the status of manufacturer.

*Id.* at 312. The court found that the sign retailer "had no duty to disassemble the sign to search for hidden defects of the type alleged in this case." *Haley*, 4 So.3d 307 at 314.

The case at hand presents a factually similar situation, and thus calls for a similar analysis. While Defendant made some changes to the hose, as did the defendant in *Haley*, this Court finds that the mere actions of cutting the hose to the proper length, and installing end-fittings and a scuff guard do not transform Defendant into a manufacturer within the meaning of the LPLA.

Though Plaintiffs do not mention the apparent-manufacturer doctrine by name, Plaintiffs' memoranda appear to implicate the doctrine. Under the apparent-manufacturer doctrine, a court may find a distributor or seller liable for a defective product, *inter alia*, if it "held the product out to the public as its own." *Chevron USA, Inc. v. Aker Maritime, Inc.*, 604 F.3d 888, 895-896 (5th Cir. 2010) quoting *Chappuis v. Sears Roebuck & Co.*, 358 So.2d 926, 928-29 (La. 1978). Plaintiffs argue that Defendant "affixed" a name plate to the hose (docs. 62 & 64). However, it is undisputed that the hose was *also* marked with "Crane Resistoflex." The Fifth Circuit in *Chevron* synthesizes the Louisiana jurisprudence regarding the apparent-manufacturer doctrine:

> Thus, these Louisiana cases tend to demonstrate that when the distributor's actions give the buying public a basis to assume that it may be the manufacturer of a product it distributes, a jury will usually be within its province to conclude that the distributor held itself out as the product's manufacturer, even though the indications may be less than clear and the ambiguity as to the actual manufacturer may subsequently be clarified.

604 F.3d 888 at 897. James E. Lloyd, Honeywell's reliability engineering leader, stated in his affidavit that he knew the hose was manufactured by Resistoflex; the purchaser, Honeywell, knew that Resistoflex was the manufacturer of the hose and Defendant was not. The Court finds that Plaintiffs have failed to set forth the evidence from which a reasonable fact-finder could conclude that Defendant either held the hose out as its own, gave the customers a basis to assume that Defendant may be the manufacturer of the product it distributed, or that Defendant had a reputation as a manufacturer of the hose.

Having so concluded, the Court notes that Defendant may still be liable in tort if he knew or should have known of a defect but failed to declare it to Honeywell. *Jackson v. Sears Authorized Retail Dealer Store*, 821 So.2d 590, 593 (La. App. 2d Cir. 6/12/02). Defendant alleges that once the hose passed pressure testing, there was no way for it to discover such a defect.

In *Jackson,* the plaintiff was injured when he sat on a chair at Sears, and the chair tipped over. 821 So.2d 590 at 591-93. Sears assembled the chair, but the chair had been manufactured by another company. *Id*. The plaintiff filed a lawsuit

11

under the LPLA against Sears, and Sears moved for summary judgment on the grounds that it did not manufacture the chair, and was thus a non-manufacturing seller. The Second Circuit affirmed summary judgment and stated that:

> Of course, the law is clear that a non-manufacturing seller of a defective product is not responsible for damages in tort absent a showing that he knew or should have known the product was defective and failed to declare it. Nor is a non-manufacturing seller required to inspect the product prior to sale to determine the possibility of inherent vices or defects.
>
> Under these legal standards, it is obvious that, as a matter of law, Sears, as a non-manufacturer seller, had no duty to inspect or test the product for the type of inherent design vices or defects alleged in this case. The imposition of such a duty would effectively make the non-manufacturing seller a guarantor against defects over which it had no control or responsibility. The light of reason illuminates the unduly onerous burden such duty would inflict upon retailers.

*Jackson*, 821 So.2d 590 at 593. In the present case, the undisputed evidence indicates (from both Honeywell and Plaintiffs' expert) that the Teflon® inner liner, manufactured by Resistoflex, was the defective product that caused the hose to rupture, thereby causing the Plaintiffs' alleged injuries (doc. 62, p. 3). Because the court has found, for purposes of the motion, that Defendant is a non-manufacturing seller of the hose, Defendant neither had a duty to inspect the hose for defects, nor is liable to Plaintiffs for a hidden defect. Moreover, Plaintiffs have failed to set forth evidence to establish that the defect in the Teflon® liner was an apparent defect

which should have been known to Triplex. Accordingly, Plaintiffs have failed to establish a genuine issue of fact with regard to an element essential to their claims.

## CONCLUSION

For the foregoing reasons, the cross motion for summary judgment, filed by Plaintiffs is hereby **DENIED**. The motion for summary judgment, filed by Defendant, is hereby **GRANTED** and judgment shall be entered in favor of Defendant, dismissing this action.

Baton Rouge, Louisiana, October 13, 2010.

_____
BRIAN A. JACKSON
UNITED STATES DISTRICT JUDGE
MIDDLE DISTRICT OF LOUISIANA